lml

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 10-40060-JAR |
| | ) | |
| | ) | |
| **ANTONIO ESQUIVEL-RIOS,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court upon defendant Antonio Esquivel-Rios' Motion to Suppress (Doc. 14). Defendant moves to exclude any information, statements or evidence derived from the search and seizure the vehicle he was driving at the time of a traffic stop by law enforcement. The Court has thoroughly considered the parties' briefs and the evidence presented at the April 18, 2011 hearing on this motion, and is now prepared to rule. For the reasons stated below, defendant's motion is denied.

**I. Factual Background**

Based on the testimony and evidence admitted at the hearing on this motion, the Court finds as follows. On May 11, 2010, at approximately 6:50 a.m., Kansas Highway Patrol Trooper Andrew N. Dean was patrolling his assigned area in Wabaunsee County, Kansas. Dean observed a gold Ford Windstar minivan bearing Colorado temporary registration 645363H as it traveled eastbound on Interstate 70, and, pursuant to standard procedure, ran the temporary tag through dispatch. The dispatcher advised the Trooper that the registration came back "no return," and

that "Colorado temp tags usually don't return." Dean testified that he had encountered Colorado temporary tags before, and had them come back on file when he ran them through dispatch. Dean explained that he asked dispatch whether defendant's temporary tag came back "not on file" or "no return" because he likes to inquire into the exact verbiage so he can explain it to the occupants of the vehicles he stops. "Not on file" typically means the tag is not registered and could be fake or stolen, while "no return" typically indicates that there is no registration yet in the system. When questioned about the difference between the terms, Dean testified that they meant virtually the same to him.

Trooper Dean testified that he stopped the vehicle to verify that the registration was valid. He observed that there was nothing unusual about how the temporary tag was displayed, and the expiration date was clearly visible as June 14, 2010.

The van was occupied by three adults: the defendant, a woman, the defendant's brother, and two young children. Defendant was the driver, and produced a valid Colorado driver's license and original registration papers. Trooper Dean found the paperwork to be in order, having been registered on May 10, 2010, the day before the stop. Dean asked defendant about his travel plans, origination and destination. Defendant answered that he was traveling from Denver to Kansas City, that he worked at Sherwin-Williams, and that he had residences in both states. Dean observed that during this entire discussion, defendant exhibited extreme nervousness that did not subside. His hands shook when he was handling the documents, and he was overly friendly and polite. The trooper also observed a Bible on the dashboard, two air fresheners on the rear view mirror and one air freshener on the turn signal handle. In the trooper's experience, multiple air fresheners indicate an attempt to mask the odor of contraband

2

and a Bible in plain view on the dashboard is intended to deflect from suspicion of any wrongdoing by the occupants of the vehicle.

After returning the driver's license and registration papers to the defendant, Trooper Dean told defendant to have a safe trip. At this point, the stop had lasted approximately two minutes. Dean stepped back from the van, then stepped back forward and asked defendant if he could ask him a few questions. Dean testified that he used a normal tone of voice and he was not touching his gun or leaning on the van. Defendant agreed to answer the questions. Dean asked defendant to clarify his travel plans, explained that large amounts of drugs were being transported from the west and asked if there were any drugs in the van. Defendant answered "no." Dean then requested permission to search the vehicle. Defendant told him "go ahead," and responded "yes" when the trooper asked if he could open the back gate of the van and search under the hood and the passenger compartment. Defendant never asked the search to stop as it progressed.

Trooper Dean first discovered a glass pipe, believed to be used in smoking crack, in the seat near the spot previously occupied by the defendant's brother, Felix. When asked if the pipe belonged to him, Felix answered yes. Dean moved his search to the front of the van, where he noticed the dashboard was shiny and appeared to have been wiped down recently. Upon removing an air vent in the dashboard, the trooper found a cellophane-wrapped package containing a substance later determined to be methamphetamine. He also seized four cell phones, a Bible, clothing, miscellaneous papers, and a large Cabela's bag.

All occupants of the vehicle were taken into custody and transported to Alma, Kansas where they were met by David Grittman and Robert Taylor, operatives of the Drug Enforcement

Administration. All three adults invoked their rights to counsel upon advisement of their *Miranda* rights, and the agent did not question defendant any further. Approximately thirty to forty minutes later, defendant approached Agent Taylor and indicated he wanted to talk. After consulting the United States Attorney's office, Agent Taylor re-advised defendant of his *Miranda* rights, and defendant signed a waiver. Defendant was interrogated by the officers for approximately two hours. During the interview, Agent Taylor testified that he realized the address on the title to the van was connected with another investigation and address in Kansas City. Defendant told him that people he worked for lived and worked at this address. Defendant stated that he would provide information on others involved in drugs if the officers would let the woman and her children go, and that his brother was responsible for the drugs found. The officers told defendant that they could not offer any guarantees, and the interview ended.

## II. Discussion

"'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[1] The principles of *Terry v. Ohio*[2] apply to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[3] The court makes a two step inquiry when addressing the reasonableness of an investigative stop. The first

---

[1] *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[2] 392 U.S. 1 (1968).

[3] *Id*. at 19–20.

inquiry is "whether the stop was justified at its inception."[4] The second inquiry is "whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop."[5]

### A. Initial Stop

"A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction."[6] The officer's subjective motives are irrelevant and the Court examines only whether the stop was objectively justified.[7] Moreover, a reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[8]

During a routine traffic stop, an officer may request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings.[9] And an officer may ask questions unrelated to the reason for the stop as long as the questioning does not extend the length of the detention.[10]

Trooper Dean testified that he stopped defendant after running his Colorado temporary tag through dispatch and learning that there was no return of a registration. It is a traffic

---

[4] *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005).

[5] *Id.*

[6] *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.), *cert. denied*, — U.S. —, 129 S. Ct. 2881 (2009).

[7] *United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009).

[8] *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[9] *United States v. Williams*, 271 F.3d 1262, 1267-68 (10th Cir. 2001).

[10] *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006).

violation in Kansas "[t]o operate, or for the owner thereof knowingly to permit the operation, upon a highway of any vehicle, as defined in K.S.A. 8-126, . . .which is not registered. . . ."[11]

Defendant challenges Trooper Dean's initial stop of his vehicle, arguing that because the temporary license tag was visible and displayed in accordance with law, the trooper lacked a reasonable suspicion to stop the van based on the dispatch computer results showing the temporary tag "did not return."

Defendant argues that the facts of this case are "virtually the same" as those in *Delaware v. Prouse*,[12] where the Supreme Court considered the constitutional validity of random traffic stops to check driver's licenses and car registrations. The Court ruled such stops unconstitutional, concluding

> [We] hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping the automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.[13]

As the government points out, however, the officer in *Prouse* was performing random spot checks without the benefit of checking on the status of a license tag with dispatch. By contrast, Trooper Dean based his reasonable suspicion on the fact that the dispatcher was unable to find a registration on file for the temporary tag. Thus, defendant's attempt to extend *Prouse* to this case is not persuasive.

---

[11]K.S.A. § 8-142.

[12]440 U.S. 648 (1979).

[13]*Id*. at 663.

Defendant also cites three Tenth Circuit cases in support of his argument. In *United States v. Edgerton*[14] Trooper Dean stopped the defendant's vehicle because he could not read the temporary tag.[15] The Tenth Circuit held that "[o]nce [the trooper] was able to read the Colorado tag and deem it unremarkable, any suspicion that defendant had violated [the Kansas statute relating to the display of license plates] dissipated . . . [and] [the trooper], as a matter or courtesy, should have explained to the Defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration."[16] Similarly, in *United States v. McSwain*,[17] a state trooper stopped the defendant's vehicle "for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker."[18] As the trooper approached on foot, he verified the tag was valid and had not expired.[19] And, most recently, in *United States v. Trestyn*,[20] the trooper initiated the traffic stop for the sole purpose of determining whether the vehicle violated the Wyoming statute regarding the display of license plates; once the trooper was able to observe the required information on the license plate, the purpose of the stop was satisfied.[21]

These cases, however, are readily distinguishable from this case. In all three cases, the

---

[14]438 F.3d 1043 (10th Cir. 2006).

[15]*Id*. at 1044.

[16]*Id*. at 1051.

[17]29 F.3d 558 (10th Cir. 1994).

[18]*Id*. at 561.

[19]*Id*.

[20]—F.3d—, 2011 WL 1783008 (10th Cir. May 11, 2011).

[21]*Id*. at *8-9.

7

officer's observations after the stop revealed that there was no equipment or license tag violation. Here, in contrast, Trooper Dean did not conduct the initial stop because he could not read or see the temporary tag, but because when he ran the tag through dispatch, it came back "no return." That suggested to him that there was a possible violation because the licence tag did not return as being registered, and provided reasonable suspicion to stop the vehicle and investigate whether it was properly registered.

Courts repeatedly have found that officers have reasonable suspicion to stop a vehicle and check it for proper registration after a computer search showed the license tag was not on file.[22] Indeed, Judge Crow recently rejected the proposition that an officer is unable to base reasonable suspicion upon the results of a computer search of a vehicle's license plate when the license plate on its face appears valid. In *United States v. Lee-Speight*,[23] the court explained,

> Kansas law requires a vehicle to be registered, and the defendant correctly notes that a license plate is "used to externally evidence registration of a vehicle." K.S.A. 8-147. Of course, the statute does not say that the license plate is the only available and reliable evidence of registration. Such other reasonably available and reliable proof necessarily includes the state's computer database of vehicle registrations and the owner's possession of a registration receipt. Thus, the particularized and objective information from a computer database search showing no registration on file and the appearance of a license plate as current and lawful creates an ambiguous situation, one that is potentially lawful and potentially unlawful, and certainly satisfies the central purpose of an investigative detention.[24]

The Court concludes, therefore, that the stop of defendant in this case was justified at its

---

[22]*United States v. Lee-Speight*, No. 10-40035-SAC, 2010 WL 2653412, at * 4 (D. Kan. June 29, 2010) (collecting cases).

[23]*Id*.

[24]*Id*. at *6.

inception.

   B.   **Scope of the Stop**

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place."[25] "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[26] However, in the course of a routine traffic stop, an officer may "request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation."[27] An officer may also run a simultaneous check of the detainees' criminal history.[28] Thereafter, "when a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning."[29] Under Supreme Court precedent, "the subjective intentions of the officer [do] not make the continued detention of respondent illegal under the Fourth Amendment. . . . as long as the circumstances, viewed objectively, justify that action."[30]

In this case, there is no evidence that the stop was prolonged beyond what was necessary

---

[25] *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[26] *United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[27] *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

[28] *United States v. McRae*, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996).

[29] *Patten*, 183 F.3d at 1193 (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)).

[30] *Ohio v. Robinette*, 519 U.S. 33, 38 (1996) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

to effectuate the purpose of the stop. Applying K.S.A. §§ 8-142 and 147 objectively, Trooper Dean was permitted to ask for vehicle registration papers and identification. Although he took the opportunity to ask defendant a few more questions, he did so only while looking over the registration documents. "[T]he content of police questions during a lawful detention does not implicate the Fourth Amendment as long as those questions do not prolong the detention."[31] Trooper Dean testified that as soon as he verified the vehicle was properly registered, he returned defendant's documents and advised him to have a safe trip. The entire length of the stop, from the moment they pulled to the side of the road until he returned their papers, was approximately two minutes. Under the totality of the circumstances, the Court finds that the length of the detention was within the scope of the initial stop and reasonable under the Fourth Amendment.

### C. Consensual Encounter

Here, the detention ended at the two minute mark, when Trooper Dean returned all of defendant's documents to him. At this point, their encounter became consensual. After the purpose of a traffic stop is complete, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible.[32] In general, prolonging the detention for further questioning beyond that related to the initial stop is permissible in two circumstances: (1) if the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) if the initial detention has become a consensual encounter.[33] "A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the

---

[31]*United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007) (citing *Muehler v. Mena*, 544 U.S. 93, 101 (2005)).

[32]*United States v. Bradford*, 423 F.3d 1149, 1156-57 (10th Cir. 2005).

[33]*United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

license and registration and asks questions without further constraining the driver by an overbearing show of authority."[34] The Tenth Circuit follows a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned."[35]

Here, Trooper Dean handed the documents back to defendant, and advised him to travel safely. Dean then stepped back from the van a few steps, then stepped forward and asked defendant if he could ask him some questions. Dean used a normal tone of voice, was not touching his gun or leaning on the van. Defendant responded yes, and Dean then explained that there were large amounts of illegal drugs being transported from the west coast and asked whether defendant had any drugs in the van. When defendant responded no, Dean then asked if he could search the van, and defendant assented three times as the search progressed.

Defendant argues that the consent was the fruit of the illegal stop. Citing *Brown v. Illinois*,[36] defendant argues that the consent given was not voluntary because there was insufficient attenuation or break in the causal connection between the illegal detention and the consent. *Brown* is not applicable to this case, however, as defendant's consent was not given after an illegal stop.[37] Because the Court has ruled that the initial stop was justified, there is no

---

[34]*United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

[35]*Bradford*, 423 F.3d at 1158.

[36]422 U.S. 590 (1975).

[37]*Id.* at 603-04 (explaining that to satisfy the burden of showing that the primary taint of the illegal stop was purged so that the subsequent consent was voluntary in fact, the court must consider the temporal proximity of the illegal stop and consent, any intervening circumstances, and purpose and flagrancy of the official misconduct); *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994).

"poisoned fruit."[38]

Considering the totality of the circumstances, the Court finds that defendant's detention was transformed into a consensual encounter when Trooper Dean returned defendant's paperwork and told him to have a safe trip. Neither Trooper Dean's testimony, nor the video of the stop, supports the finding that he made any "coercive show of authority" such that a reasonable person would not have felt free to leave.[39] There is no evidence that the trooper used any force throughout the encounter, brandished his weapon, made any threats or commands, or physically touched defendant. Therefore, the Court finds that defendant's consent to the search was voluntarily given and was not obtained in violation of the Fourth Amendment.

Even if defendant's consent was not voluntary, however, at this point there was reasonable suspicion supporting the continued detention of defendant and the continued search of the vehicle.[40] By the time Trooper Dean began his search of the cab, he knew or observed the following facts, which gave him reasonable suspicion: 1) defendant's travel plans and statement that he owned two residences in Colorado and Kansas was suspect; 2) during this entire discussion, defendant exhibited extreme nervousness that did not subside, his hands shook when he was handling the documents, and he was overly friendly and polite; 3) a Bible was in plain

---

[38]Assuming that the initial stop was improper, the Court finds that the statements given by defendant approximately four hours after his arrest would be admissible under *Brown*, given the intervening multiple consents, the discovery of the crack pipe and methamphetamine in the dashboard, the initial *Miranda* warning, the honoring of defendant's invocation of his *Minranda* rights, the secondary approach by defendant, and the second *Mirandization*, coupled with the fact that the law enforcement officers did not proceed until they had obtained legal advice and re-*Mirandized* defendant. *See Brown*, 422 U.S. at 603-04.

[39]*United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991) (discussing factors for finding a "coercive show of authority").

[40]*United States v. White*, 584 F.3d 935, 949 (10th Cir. 2009) ("[t]he traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.") (quoting *United States v. Clarkson*, 551 F.3d 1196, 1201(10th Cir. 2009)).

view on the dashboard; and 4) two air fresheners on the rear view mirror and one air freshener on the turn signal handle.  To the extent the encounter was no longer consensual by the time Trooper Dean began his search of the van, there was reasonable suspicion justifying the search of the van.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress (Doc. 14) is **DENIED.**

**IT IS SO ORDERED.**

Dated: May 17, 2011

                                                  S/ Julie A. Robinson
                                                  JULIE A. ROBINSON
                                                  UNITED STATES DISTRICT JUDGE