IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 10-40060-01-JAR |
| | ) | |
| | ) | |
| ANTONIO ESQUIVEL-RIOS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Defendant Antonio Esquivel-Rios was convicted by a jury on one count of possessing

with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1).  By order of

the Tenth Circuit Court of Appeals, these proceedings were remanded to this Court to reconsider

whether the traffic stop of Defendant's vehicle violated the Fourth Amendment.  Defendant

renewed his Motion to Suppress to include all post-arrest statements (Doc. 152).  The Court

conducted an evidentiary hearing on March 6, 2014, and the parties submitted supplemental

briefing (Docs. 146, 146, 159, 162).  The Court has carefully considered the evidence presented

as well as the argument and submissions of counsel.  For the reasons explained in detail below,

the Court denies Defendant's Motion to Suppress.

## I.     Procedural and Factual History

The facts and  procedural history of this case are undisputed and the Court assumes the

reader is familiar with the Tenth Circuit opinion that precipitates the matters before the Court,

*United States v. Esquivel-Rios*.[1]  The Court will not restate the pretrial facts in detail, but will provide excerpts from the opinion as needed to frame its discussion on remand.

On March 10, 2011, Defendant was indicted on one count of possession with the intent to distribute approximately 1.25 pounds of a mixture containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1).  This charge stemmed from a search of Defendant's vehicle during a car stop on Interstate 70 in Kansas, on May 11, 2010, when Kansas Highway Patrol Trooper Andrew Dean stopped his vehicle and found 448 grams of methamphetamine hidden in the dash during a subsequent search.  Defendant moved to suppress this evidence, claiming that Trooper Dean stopped his vehicle in violation of the Fourth Amendment.  After conducting an evidentiary hearing, this Court denied Defendant's motion, finding the stop was justified at its inception because Defendant's vehicle was bearing a Colorado temporary tag that a Kansas Highway Patrol dispatcher reported was not on record and not returning.  A jury convicted Defendant on the charged offense.  On May 15, 2012, this Court sentenced Defendant to serve 188 months' custody.

Defendant directly appealed this Court's denial of his Motion to Suppress to the Tenth Circuit Court of Appeals, claiming the traffic stop was unlawful in the first instance because Trooper Dean did not have reasonable suspicion to stop his vehicle.[2]  The Circuit devoted much discussion to a "garbage in, garbage out" analysis with respect to the computer database, focusing on the "no return" response from the queried database and the dispatcher's comment

---

[1]725 F.3d 1231, 1239 (10th Cir. 2013).

[2]*Id*. at 1235.  Defendant also challenged three other points concerning the administration of his trial, which the court rejected.  *Id*. at 1239–43.

2

prior to the stop that "Colorado temp tags usually don't return."[3]  The court found this "piece of evidence . . . suggest[ed ]that the database on which the officer relied to justify his stop might bear a real problem—a problem that might mean a 'no return' *doesn't* suggest criminal conduct but only some bureaucratic snafu."[4]  The court noted that it had reserved judgment on this issue in *United States v. Cortez-Galaviz,*[5] where the court found that an indication of insurance information "not found" was sufficient grounds to stop an individual later found to be engaged in illegal conduct.[6]  As the court explained, "[t]he defendant in that case *asserted* the database there was unreliable but produced no *evidence* suggesting so much."[7]  In rejecting defendant's motion to suppress, the *Cortez-Galaviz* court placed the onus of establishing the database in question is unreliable on the defendant.[8]  Turning to the facts in this case, the court found that it knew nothing about the database on which this case hinges, and further, that this Court "failed to engage with evidence seeming to call the database into question."[9]  Accordingly, the court directed this Court "to reconsider, informed now by a full appreciation for all the circumstances surrounding the 'no return' report and their consequences for the database's reliability," whether Trooper Dean's traffic stop of Defendant's minivan violated the Fourth Amendment.[10]

---

[3]*Id*. at 1235.

[4]*Id*. (emphasis in original).

[5]495 F.3d 1203 (10th Cir. 2007).

[6]*Id*. at 1206.

[7]*Esquivel-Rios*, 725 F.3d at 1235 (emphasis in original).

[8]*Id*.

[9]*Id*. at 1237–38.

[10]*Id*. at 1243.

3

The Circuit also directed that if this Court on remand finds reasonable suspicion absent and the Fourth Amendment violated, it should proceed to the question whether exclusion is an appropriate remedy:

> If, at the end of the day, the district court on remand finds reasonable suspicion absent and the Fourth Amendment violated, it should proceed to the question (raised by the government below but also as yet unaddressed by the district court) whether exclusion is an appropriate remedy, following the mode of analysis dictated by the Supreme Court in *Davis v. United States*, 131 S. Ct. 2419 (2011) and *Herring v. United States*, 555 U.S. 135 (2009).  Even if the district court on remand doesn't find a Fourth Amendment violation, we believe it would still be prudent for that court to consider the remedial question.  Doing so in this and other similarly close cases can help avoid the potential need for (further) remands.[11]

### Evidence at Post-Remand Hearing

Sydney Profancik, a Customer Service Coordinator II with the Colorado Bureau of Investigation ("CBI") testified that the CBI is responsible for maintaining the interface between the National Crime Information Center ("NCIC") and the Colorado Crime Information Center ("CCIC"), making Colorado criminal justice records available to all federal and state law enforcement agencies through request queries to the CCIC.[12]  In 2012, the CBI and the CDMV loaded the CCIC database with temporary tags issued in December 2011 or later.[13]  Profancik stated that prior to 2012, Colorado temporary tags were not entered into the CBI's computer system, even though they were in the CDOR system.[14]  She explained that in 2010, a Kansas

---

[11] *Id*. at 1239.

[12] Doc. 156, Tr. Hr'g. at 8.

[13] Ex. 503, 504.

[14] Doc. 156, Tr. Hr'g. at 10, 20–21, 23.

dispatcher would not have had access to the CDOR's records by the ususal computer system; rather, in order to access the CDOR's system, a Kansas dispatcher "would have to have been either through a phone call or through an administrative message to the Department of Revenue."[15]  She stated that in 2010, no database existed that could provide law enforcement agencies with responses to queries on Colorado vehicles.[16]  She testified that when accessing the CBI's system in 2010, there were no warnings that would have alerted a Kansas dispatcher that the CDOR records regarding temporary tags were not in the CBI or NCIC system; instead, "[i]t would just state that there was no record."[17]  The CCIC system would not have responded to a temporary tag query with the message "no return."[18]  Profancik clarified that in 2010, a dispatcher's query about a temporary tag in the CBI system, which she sometimes referred to as CCIC, was not a reliable source for information about temporary tags in Colorado, which was "common knowledge" with Colorado law enforcement.[19]

James Kautz, a criminal investigator for the Colorado Division of Motor Vehicles ("CDMV"), testified that Defendant's temporary tag was purchased at a CDMV office in Adams County, Colorado, on May 10, 2010.[20]  The tag number was 645363H.[21]  The Colorado Department of Revenue ("CDOR") uploaded the information about the temporary tag to its

---

[15]*Id*. at 10.

[16]*Id*. at 15.

[17]*Id*. at 10–11.

[18]*Id*. at 17.

[19]*Id*. at 2, 23.

[20]*Id*. at 27–28; Ex. 506.

[21]Exs. 506, 501.

database on May 13, 2010.[22]  Accordingly, Kautz explained that a computer query of the

CDOR's database would not have turned up this particular temporary tag until May 13.[23]  Kautz

verified that there was a time period before 2012 when the CDOR information about temporary

tags was not loaded into the CBI computer system, and that the uploading of temporary tag

information was completed in July 2012.[24]  Kautz testified that in 2010, a dispatcher would have

to call someone at the CDOR to ask about temporary tag information, and the information

conveyed to officers by a dispatcher who ran a computer search would have been "no record

available," or "not on file."[25]  He clarified that while he could not recall the exact wording, a

query of temporary tags prior to 2012 would result in a reply, but there would be no

information.[26] While there was no written warnings or formal training on the situation, the

response to a temporary tag query was something an officer in Colorado learned on the job.[27]

Kautz testified that a search for temporary tags prior to 2012 was "futile" and not reliable.[28]

　　　　Both the CBI and CDOR also submitted written responses to questions submitted by the

Government, which were admitted as evidence at the hearing on remand.  The CBI response

stated, "[u]ntil July 2012, Colorado temporary license plates were not available in the database

used to respond to law enforcement license plate inquiries.  Due to the lack of availability of the

---

[22]Doc. 156, Tr. Hr'g. at 27-28; *see also* Ex. 507.

[23]*Id*. at 28.

[24]*Id*. at 29.

[25]*Id*. at 31, 35

[26]*Id*. at 35.

[27]*Id*.

[28]*Id*.

records prior to July 2012, all temporary tag queries would elicit a 'not on file' response."[29]  The CDOR response stated, "This information [on temporary tags] is not retrieved through the Colorado Department of Revenue, but through a database maintained through the Colorado Bureau of Investigations."[30]

On May 11, 2010, at approximately 6:50 a.m., Trooper Dean was patrolling eastbound Interstate 70 Highway in Wabaunsee County, Kansas, about twenty-five miles west of Topeka.[31]  While on patrol, he observed Defendant's vehicle bearing the Colorado temporary tag.[32]  He ran the temporary tag through the Kansas Highway Patrol's dispatch.[33]  Dispatcher Derek Lathan handled the request.[34]

Lathan ran the request through various law enforcement agencies, as evidenced by Defendant's Exhibit 516, which Lathan described as "our return from when we run the tag."[35]  According to Lathan, the return "shows that we checked the Colorado license, it checked Kansas registry offender files, Kansas' BOLO, and Kansas wanted files all with that tag number."[36]  He explained, "[i]t checks several things at once when we run a tag number."[37]

---

[29]Ex. 503.

[30]Ex. 505.

[31]Doc. 156, Tr. Hr'g. at 64–65.

[32]*Id*. at 65.

[33]*Id*. at 65, 75.

[34]*Id*. at 65–66; 37–38.

[35]*Id*. at 51.

[36]*Id*.

[37]*Id*.

The return showed that all inquiries regarding the tag number and the VIN of the vehicle came back negative.[38]  There are five search results on the return.  A cross-check of the tag number with "Kansas Wanted Person" came back as "no match."[39]  A cross-check of the tag number with "Kansas BOLO" came back as "no match."[40]  A cross-check of the tag number with "Kansas Registered Offender" came back as "query by lic is not supported."[41]  A cross-check with NCIC came back as "no record lic/645363H lis/co."[42]  Lathan described that entry as "an NCIC return showing there's no wants or warrants associated with that vehicle, which is nationally."[43]  None of these reports were from Colorado.

Lathan received two responses from Colorado.  A cross-check of the tag number with "NLETS" came back as "not on file," based on a "response from DMV," presumably an acronym for "Department of Motor Vehicles."[44]  Lathan testified that he did not know what the acronym NLETS stood for, but that it queried NCIC and was run through the Colorado system.[45]  He further testified that he was not sure which Colorado agency was designated to interface with NCIC, but thought it was either the Colorado DMV, the Colorado State Patrol, or the CBI.[46]  A

---

[38]Ex. 516.

[39]*Id.* 1, ¶ 1.

[40]*Id.* at 1, ¶ 2. Lathan explained that "BOLO" is an acronym for "be on the lookout." Doc. 156 at 57.

[41]Ex. 516 at 1, ¶ 3.

[42]*Id.* at 1, ¶ 4.

[43]Doc. 156 at 58.

[44]Ex. 516 at 1, ¶ 5.

[45]Doc. 156, Tr. Hr'g. at 39.  NLETS is an acronym for National Law Enforcement Telecommunications System. *See* http://www.nlets.org/

[46]*Id.*

later cross-check of the vehicle's identification number with NLETS came back as "not on file" based on a "response from DMV."[47]  Lathan testified that he must have run this last query after Trooper Dean stopped the vehicle.[48]

Based on all but the last of these inquiries, Lathan reported to Trooper Dean that the tag was "negatory on record, not returning":

| | |
|---|---|
| Dean: | 19 Topeka 28 through Colorado |
| Dispatch: | 19 |
| Dean: | Colorado temporary 645363H |
| Dispatch: | Topeka State 19, that's negatory on record, not returning |
| Dean: | 10-4 |
| Dean: | Was that not on file or just no return[?] |
| Dispatch: | Colorado temp tags usually don't return |
| Dean: | 10-4[49] |

Lathan testified that prior to 2010, he could not recall times when he was able to get information on temporary tags from Colorado, and "[t]hey just started here recently, like in the last year or two."[50]  He agreed that when this particular query occurred, he pretty much had an idea that he was not going to get anything back.[51]  He further agreed that at this point in time, every time he had queried a Colorado temporary tag, it did not return.[52]  When asked why he qualified his response by saying "Colorado temp tags usually don't return," Lathan explained that he was responding to Trooper Dean's question about whether the query result was not on

---

[47]Ex. 516 at 2; Doc. 156 at 60.

[48]Doc. 156, Tr. Hr'g. at 60, 63.

[49]Ex. 502 at 1 (Track 01).

[50]Doc. 156, Tr. Hr'g. at 41–42.

[51]*Id*. at 42.

[52]*Id*. at 49.

file or no return.[53]  Although he told Trooper Dean that the tag was "not returning," Lathan

testified that the information he received back on the return actually was "[n]o match and not on

file."[54]  He further explained that "not returning" meant that no information came back from the

tag query.[55]  Lathan also testified that in his mind, there was no functional difference between

"not on file" and "not returning," because in both cases, no information returns regarding

registration or ownership of the vehicle.[56]

At the time of the stop of Defendant's vehicle in 2010, Lathan had not received any alerts

or training regarding the fact that information on Colorado temporary tags was not being entered

by the Colorado DMV into the CBI system, and all of his information on returns was based on

personal experience.[57]  Lathan testified that the first he had heard that Colorado changed their

practice in 2012 was the morning of the hearing, when the prosecutor told him.[58]

Trooper Dean testified that in his estimation, the terms "tag not on file" and "no return"

meant the same thing:

> I mean I—at that time, and based on the dispatcher's statement,
> you know, when I asked him the difference, I felt the tag was not
> on file at the time.  A no return response, I felt that it was the same.
> But I also know that in the past we had received responses from
> dispatch they would say that a tag, for example, was slow in
> returning or slow in responding, which would indicate to me that it
> could be just that the files are being slow to retrieve the

---

[53]*Id*. at 50.

[54]*Id*.

[55]*Id*. at 44.

[56]*Id*. at 45.

[57]*Id*. at 40–41.

[58]*Id*. at 45.

> information.  But the not on file and no return, I mean, I felt like they were the same, basically.  I mean, there was no information to give me on that tag.[59]

Dean further testified that he asked the dispatcher for clarification on whether the tag came back not on file or no return so he could relay the correct information to the motorist as to why they were being stopped.[60]

Trooper Dean further testified that based on the response he received from dispatch, he decided to pull Defendant's vehicle over "to basically verify that the tag was valid."[61]  While he noticed nothing unusual about the tag attached to the vehicle before he stopped it, he explained: "Typically, when you have a temporary tag, or even your regular tag on your car, you're going to have some type of registration receipt.  And I felt the only way to attempt to verify that the tag was valid was to stop the vehicle and to review the paperwork that they might have had at the time."[62]  Dean testified that in his experience as a trooper, he had seen forged or altered temporary tags before, and he considered that in determining the validity and lawfulness of the operation of motor vehicles on Kansas roads to be part of his agency's mission.[63]  To him, stopping the vehicle was the only way to determine if the tag and vehicle were properly registered.[64]  At the first suppression hearing, Dean explained that in his opinion, a report of a tag "not on file" could mean that the vehicle was not registered, or that the tag was fictitious or

---

[59]*Id.* at 67–68.

[60]*Id.* at 71.

[61]*Id.* at 69.

[62]*Id.*

[63]*Id.* at 70–71.

[64]*Id.* at 87.

stolen, or had not yet been put into the computer system because of some glitch, or that the tag was valid.[65]  Upon stopping the vehicle, Dean inspected the registration documents provided by Defendant and determined that the vehicle was properly registered.[66]  He eventually asked for and received consent from Defendant to search the vehicle.[67]

On the date of the stop, Trooper Dean had not received any training that the Colorado temporary tag system was not working as expected, that is, that the CDOR information was not available to a computer query.[68]  Dean testified that he was "under the impression that we had received returns back on Colorado temp tags at the time."[69]  He did not "remember ever thinking to [himself] that, you know, they just never come back," but conceded that "there were certain temporary tags that I do kind of remember thinking it seemed like we got a no return or not on file response back a lot on those. . . ."[70]  When he pulled Defendant over, he did not believe that Colorado's computer system was not reliable.[71]  Dean explained that he had encountered many temporary tags on prior occasion that had come back "not on file, and that was how he treated this stop."[72]  Dean stated that he interpreted Lathan's response that Colorado temporary tags "usually don't return" as indicating that "there was no information there for me to . . . validate

---

[65]Doc. 101, Tr. 4/18/11 Mot. Hr'g. at 32–33.

[66]*Id*. at 82–83.

[67]*Id*. at 83.

[68]*Id*. at 71–72.

[69]*Id*. at 72.

[70]*Id*.

[71]*Id*.

[72]*Id*.

the tag and determine whether or not the vehicle . . . is actually registered."[73]  He testified that when he provided dispatch with the tag number, he "could rely on our dispatchers to give me the appropriate information, the accurate information, for the vehicle and the tag."[74]

## II.   Discussion

The Fourth Amendment requires a traffic stop to be "objectively justified" at its inception.[75]  That means that a traffic stop must be 1) "based on an observed traffic violation" or 2) based on an officer's "reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[76]  "In order to conduct a lawful investigatory stop of a vehicle, the detaining officers must have, based on all the circumstances, 'a particularized and objective basis for suspecting the particular person stopped of criminal activity."[77]  The law requires far less than perfect certainty of a traffic violation before an officer may initiate a stop.[78]  "A determination that reasonable suspicion exists. . . need not rule out the possibility of innocent conduct."[79]  "Officers merely need an articulable reasonable suspicion that criminal activity may be afoot—they need not even assert a 'fair probability' that their investigation will actually turn up evidence of criminal activity."[80]  As the Tenth Circuit noted, courts have regularly upheld a

---

[73]*Id*. at 75, 86.

[74]*Id*. at 77.

[75]*United States v. Nicholson*, 721 F.3d 1236, 1238 (10th Cir. 2013).

[76]*Id*. (quoting *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009)).

[77]*United States v. Leos-Quijada*, 107 F.3d 786, 792 (10th Cir. 1997) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

[78]*Esquivel-Rios*, 725 F.3d at 1235.

[79]*United States v. Arvizu*, 534 U.S. 266, 277 (2002).

[80]*United States v. Lopez*, 518 F.3d 790, 799 (10th Cir. 2008).

traffic stop based on information that a defendant's vehicle registration failed to appear in a law enforcement database—"at least when the record suggested no reason to worry about the database's reliability."[81]

### A.     Reasonable Suspicion

In its supplemental briefing submitted prior to the March 5 evidentiary hearing, the Government conceded that the "negatory on record, not returning" report that dispatch provided to Trooper Dean in response to his inquiry about Defendant's temporary tag did not qualify as particularized evidence that Defendant's vehicle was not properly registered.[82]  This concession was based on the fact that Trooper Dean made his inquiry in May 2010, when the CDOR did not provide temporary tag data to the CBI that would have allowed law enforcement to confirm the validity of a temporary tag through a license plate inquiry.  Because no data existed to report, the dispatcher's report to Dean that no data existed about the tag did not provide an objective basis for concluding the tag was valid, stolen or forged.

After the evidentiary hearing, however, the Government changed its position on reasonable suspicion, arguing that the CDMV's response of tag "not on file" provided reasonable suspicion to support the stop in the first instance.[83]  The Government bases its argument on the following evidence presented at the hearing: 1) on the date of the stop, the CCIC database maintained by the CBI contained no information regarding the temporary tag at issue—or any

---

[81]*Esquivel-Rios*, 725 F.3d at 1235 (citing cases); *see also United States v. Lee-Speight*, No. 10-40035-SAC, 2010 WL 2653412, at *4 (D. Kan. June 29, 2010) (collecting cases where reasonable suspicion found based on dispatch report that tag was "not on file" or similar).

[82]Doc. 145 at 8.

[83]Doc. 159 at 10–11.

temporary tags issued by the CDOR—because the CDOR's temporary tag information was not loaded into the CCIC database prior to 2012; 2) the CDOR uploaded information about Defendant's temporary tag into its own database, which was not accessible through CCIC, on May 13, 2010—three days after the stop; 3) a computer query into the CDOR's database would have revealed information about Defendant's temporary tag if the query had been made after May 13, 2010; 4) in running his checks, KHP dispatcher Lathan did not access the CCIC database; rather, he accessed the CDMV database maintained by the CDOR; and 5) the CDOR regularly entered information about temporary tags it issued into its own computer system.

The Government argues that, had Trooper Dean's information been based solely on a report from the CCIC's database, which maintained no records of temporary tags prior to 2012, any claim of reasonable articulable suspicion would be foreclosed by the reasoning of the Tenth Circuit, which stated:

> [T]he suggestion of wrongdoing diminishes even further as the number of innocuous no returns increases.  So if legitimate Colorado temporary tags are almost never placed in the database . . . getting a "no return" may tell a reasonable officer next to nothing: virtually every query would yield the same "no return" message whether the tag is legitimate or not.  And it is hard to imagine how a "no return" report in those circumstances could form a "particularized" basis to suspect wrongoing.[84]

But in this case, the Government argues, the CDOR did maintain a database of records of temporary tags issued by that department, so the fact that a query on Defendant's tag came back as "not on file" raised a reasonable suspicion that criminal activity was afoot.

As Defendant points out, however, the evidence at the hearing is not consistent with the

---

[84] *Esquivel-Rios*, 725 F.3d at 1237.

Government's position.  Sidney Profancik testified that in 2010, no Kansas dispatcher could access the CDOR temporary tag records by computer.  Instead, access could only be made by contacting the CDOR directly by phone or through an administrative message to the DOR.  Profancik testified that in 2010, no other database existed that would or could provide law enforcement with computer access to CDOR temporary tag information.  Likewise, James Kautz testified that before the changeover in July 2012, registration information on Colorado temporary tags was unavailable and not immediately accessible.  Kautz testified that dispatch could not use a computer system to make that check, but that a phone call to CDOR was needed.  And, a written statement from the CDOR requesting information on responses to computer queries states: "This information is not retrieved through the Colorado Department of Revenue, but through a database maintained through the Colorado Bureau of Investigations."[85]  Thus, Defendant argues, there is no support in the record that Lathan's query did not access the CCIC database, but instead, somehow accessed the CDMV database maintained by the CDOR.

The Government's position stems from Defendant's Exhibit 516, the transcript from the query result run by Lathan that was produced for the first time at the March 5 hearing.  Lathan testified that the two responses were received directly from Colorado, and that a cross-check of the tag number with NLETS came back as "not on file," based on a response from the DMV.[86]  Lathan testified that NLETS queried NCIC and was run through the Colorado system.[87]  He further testified that he was not sure which Colorado agency was designated to interface with

---

[85]Ex. 505.

[86]Ex. 516 at 1, ¶ 5.

[87]Doc. 156, Tr. Hr'g. at 39.

NCIC, but thought it was either the Colorado DMV, the Colorado State Patrol, or the CBI.[88]

The record before the Court indicates that there is no question that at the time of the stop in this case, the CCIC database maintained by the CBI did not contain any information regarding any temporary tags issued by the CDOR.  The record also indicates that the CDOR database was not accessible to law enforcement by computer query.  Yet, the query that Lathan ran on Defendant's temporary tag on May 11, 2010, indicates that the "not on file" response was from the CDMV.  The Government does not offer any explanation for this seemingly inconsistent result, other than to conclude that Lathan did not access the CCIC database.  The Government did not present any evidence that NLETS somehow was able to directly access the CDMV database maintained by the CDOR, or that Lathan's query was different than all the other prior queries he ran on Colorado temporary tags.  Indeed, Lathan testified that it was his experience that Colorado temporary tags never returned at that point in time, and that he all but knew what the response would be when he entered his query.  Under these circumstances, the Court has no choice but to conclude that the "negatory on record, not returning" report that dispatch provided to Trooper Dean in response to his inquiry about Defendant's temporary tag did not qualify as particularized evidence that the vehicle was not properly registered.

In so ruling, the Court notes that the Tenth Circuit recognized that the issue of whether the database was unreliable was a novel factual issue, and identified questions the Court might address on remand, including whether and what type of garbage went into the database and a statistical analysis of how, when and why queries by law enforcement of temporary tags in

---

[88]*Id.*

Colorado "don't return."[89]  Given the nature of the evidence presented at the March 5 hearing, however, the Court is compelled to specifically limit its ruling regarding the database's reliability to this specific traffic stop, or at most, any similar stop that occurred prior to July 2012.  Because the evidence presented to the Court pertained to an information sharing issue that has been changed, this decision is not to be taken as any finding or opinion on the reliability of the Colorado database system in place after July 2012.

### B.    Good Faith

Even when a Fourth Amendment violation exists, exclusion of evidence "is not an automatic consequence of a Fourth Amendment violation."[90]  Exclusion is a remedy courts may choose to apply as a "prudential" matter, not one individuals may insist on as a matter of "personal constitutional right."[91]  Exclusion of evidence is a "judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'"[92]  The "purpose of the [exclusionary] rule is not to redress the injury to the privacy of the search victim"; instead, its "prime purpose is to deter future unlawful police conduct."[93]

The Government urges that Trooper Dean's conduct at issue in this case does not rise to the level of culpability necessary for the exclusionary rule to apply.  The Government argues that Trooper Dean reasonably, but mistakenly, assumed that the report from dispatch provided

---

[89]*Esquivel-Rios*, 725 F.3d at 1236–37.  The court notes that these examples highlight problems inherent to maintaining a database on all temporary tags, not just Colorado tags.

[90]*Herring v. United States*, 555 U.S. 135, 137 (2009).

[91]*Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (internal quotation marks omitted).

[92]*Herring*, 555 U.S. at 139–40 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

[93]*Calandra*, 414 U.S. at 347 (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

18

reasonable suspicion to stop Defendant's vehicle.  Defendant counters that when Trooper Dean stopped Defendant based on information he knew in advance would not give him any information, he acted in willful violation of the Fourth Amendment.  Defendant further argues that this case presents evidence of a "long term systematic failure to reasonably maintain a law enforcement retrieval system with easily obtainable information."

In determining whether exclusion is the appropriate remedy in this case, the Court follows the mode of analysis dictated by two recent Supreme Court decisions.  In *Herring v. United States*, the Court extended the good-faith exception where, in making an arrest, police relied upon a record-keeping error in the police computer database indicating there was an active warrant for the arrestee.[94]  The Court concluded that negligent bookkeeping was no reason to exclude evidence found when an officer executed, in good faith, an arrest warrant that had been recalled, but for which the database had not been updated to reflect the recall.[95]  In discussing the principles of the exclusionary rule, the Court stated that "[t]he extent to which the exclusionary rule is justified by . . . deterrence principles varies with the culpability of the law enforcement conduct."[96]  Thus, "assessment of the flagrancy of the police misconduct constitutes an important step in the calculus of applying the exclusionary rule."[97]  The Court went on to explain that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional

---

[94]*Herring*, 555 U.S. at 143–48.

[95]*Id*. at 137–38.

[96]*Id*. at 143.

[97]*Id*. (quotation omitted).

under the Fourth Amendment."[98]  As such, "the [past] abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional."[99]  The Court clarifed that the good-faith inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances."[100]  In declining to apply the exclusionary rule on these facts, the Court explained that the rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances, recurring or systemic negligence.  The error in this case does not rise to that level."[101]

And, in *Davis v. United States*, the Court held that the exclusionary rule should not be applied against a search that was conducted in reliance upon binding judicial precedent that was later overruled.[102]  The Court explained that the deterrence benefits of exclusion vary depending on the culpability of the law enforcement conduct.[103]  When law enforcement exhibits deliberate, reckless or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh its high cost to the judicial system and society at large.[104]  The deterrence benefits associated with exclusion outweigh the costs, too, when law

---

[98]*Id*. (quotation omitted).

[99]*Id*.

[100]*Id*. at 145 (quotation omitted)

[101]*Id*. at 144.

[102]131 S. Ct. 2419 (2011).

[103]*Id*. at 2427.

[104]*Id*. (citations omitted).

enforcement exhibits "recurring or systemic negligence."[105]  But when law enforcement officers behave only non-negligently "or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force."[106]  In these cases, the deterrent value is much lower and exclusion cannot "pay its way."[107]

Thus, the crucial finding needed to suppress evidence is the balance between whether police misconduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[108]  This Court undertakes the balancing test outlined in *Herring* and *Davis* and determines whether, in light of all the circumstances, the police activity in this case is "deliberate, reckless, or grossly negligent" or if exclusion will deter "recurring or systemic negligence."[109]

In light of these principles, the Court concludes that no basis exists to apply the exclusionary rule in this case.  Trooper Dean testified at trial that the lack of information he was able to obtain from dispatch raised his suspicions in light of his experience.[110]  Dean further testified that in his mind, the terms "not on file" and "no return" were "virtually the same," and explained that he had encountered many temporary tags on prior occasions that had come back "not on file, and that was how he treated this stop."[111]  The Tenth Circuit and other courts have

---

[105]*Id.* at 2428.

[106]*Id.* at 2427–28 (citations omitted) (internal quotation marks omitted).

[107]*Id.* (quoting *United States v. Leon*, 468 U.S. 897, 908 n.6 (1984)).

[108]*Herring*, 555 U.S. at 144.

[109]*Id.*

[110]Doc. 89, Tr. Trial. at 173–74.

[111]*Id.*

not hesitated to find reasonable suspicion where dispatch reports to an officer that a tag is "not on file."[112]  As noted above, although dispatcher Lathan reported to Trooper Dean that the temporary tag was "not returning," the information he actually received back from Colorado was that the tag was "not on file."  The evidence at the hearing further revealed that "no return" was not a possible answer for a Colorado tag query; the characterization was Lathan's.  When Dean asked Lathan to clarify if the report was "not on file" or "no return," Lathan replied that "Colorado temp tags usually don't return."  Under the "fellow officer rule," Lathan's knowledge that the Colorado database query reported that the tag was "not on file" is imputed to Trooper Dean.[113]  Further, a reasonable officer in Dean's position could reasonably assume that Colorado maintained a record of temporary tags in a database available to law enforcement.  There is no evidence in the record to conclude that he kept himself unaware of how the state of Colorado maintained its databases of temporary tags.  Thus, the evidence shows that Trooper Dean reasonably, but mistakenly believed that the report from dispatch indicated that criminal activity might be afoot, and that he had reasonable suspicion to stop Defendant's vehicle.

Defendant urges, however, that Lathan's comment to Dean that Colorado temporary tags "usually don't return" should be imputed to the trooper, going so far as to argue that Dean knew before he stopped Defendant's vehicle that the database query would result in no information on file.  The Court disagrees.  Lathan's comment was made in response to Dean's request for clarification; it was not based on any specific reports or information regarding

---

[112] *See Esquivel-Rios*, 725 F.3d at 1235 (citing cases).

[113] *See United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir. 1997) (holding law enforcement officers may pool their information and that reasonable suspicion is to be determined on the basis of the collective knowledge of all the officers involved, and that the rule applies to an officer's corroboration of information received by dispatch) (citations omitted).

Colorado's temporary tag database.  Indeed, representatives from Colorado testified that only Colorado law enforcement officers had been notified, and both Lathan and Dean testified that they were unaware of the issues with the Colorado database until the morning of the hearing.

Complicating matters is Lathan's inaccurate use of the phrase, "not returning," when in fact the query of Defendant's tag did return, with a response of "not on file."  And, Lathan admitted that in his experience, Colorado temporary tags never returned, yet he told Dean they "usually" did not return.  Dean testified that he interpreted Lathan's comment as indicating that "there was no information there for me to . . . validate the tag and determine whether or not the vehicle. . . is actually registered," and did not think to himself that "they just never come back."[114]  Even assuming Dean should have followed up on Lathan's comment, Lathan would not have been able to offer Dean any particularized  information as to why Colorado temporary tags "usually" do not return, or what a return of "not on file" actually meant in Colorado. Considering all the circumstances, the Court declines to conclude that Trooper Dean should not have stopped this, or any, Colorado temporary tag because of the dispatcher's equivocal comment based on anecdotal experience.  Because Trooper Dean's conduct was not "deliberate, reckless, or grossly negligent," suppression of the evidence in this case would not provide meaningful deterrence.

Nor would exclusion deter recurring or systemic negligence by law enforcement. Defendant contends that the CBI, which is in charge of maintaining the interface between the CCIC and NCIC, failed to maintain the database by uploading temporary tag information from the CDMV, then implanted in the response to queries not a caution, but a term of art ("not on

---

[114]*Id*. at 72–75, 86.

file") that conveyed to law enforcement that a violation of the law was occurring.  Defendant argues the CBI knew that its response of "not on file" continued to be used by law enforcement, either wittingly or unwittingly.  Citing *Herring*, Defendant urges that this type of record keeping error by law enforcement is not immune from the exclusionary rule.[115]

The Court does not agree with Defendant that the CDOR's failure to share its temporary tag information with the CBI database rises to the level of "systemic negligence."  There is no evidence that the CBI database was at fault, as it simply contained the information that was entered into it; and before July 2012, the CDOR did not share its temporary tag information with the CBI's database.  Nor is there evidence Colorado negligently failed to update its database or made record keeping errors; instead, the decision to share the information with the CBI appears to have been an agency or policy decision.  That being said, the Court posits that reliance on the database by Colorado law enforcement, who had been notified that the CDOR temporary tag information was not uploaded to CCIC, might not be reasonable.  The Court declines to extend that result to the Kansas law enforcement officer acting in this case, however, as the record is uncontroverted that neither Lathan nor Dean were aware that temporary tag information was not available on the CBI or CCIC database.

In sum, the balance in this case favors admission of the evidence.  The exclusionary rule's operation is limited to situations in which the purpose of appreciable deterrence is achieved, and this is not the case.  As exclusion is a remedy of last resort, the Court finds the

---

[115]555 U.S. at 145 (explaining, "[w]e do not suggest that all record keeping errors by the police are immune from the exclusionary rule," using examples where the police have been shown to be reckless in maintaining a warrant system or have knowingly made false entries to lay the groundwork for future false arrests); 555 U.S. at 155 (Ginsburg, J., dissenting) (citing *amici* warnings that law enforcement databases are insufficiently monitored and often out of date).

benefits of deterrence in this case do not outweigh its heavy cost.  Under the collective reasoning of the Fourth Amendment precedent set forth in *Herring* and *Davis*, the Court finds a good faith exception to the exclusionary rule applies to Trooper Dean's stop of Defendant's vehicle, as well as the evidence and statements obtained as a result of that stop.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress (Doc. 152) is DENIED.

**IT IS SO ORDERED.**

Dated: August 12, 2014

 S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE